2000 ME 100

**PINE RIDGE REALTY, INC.[1]**

v.

**MASSACHUSETTS BAY INSURANCE CO. et al.**

Supreme Judicial Court of Maine.

Argued March 7, 2000.

Decided May 26, 2000.

1. The complaint named Pine Ridge Realty, Inc., (sometimes referred to by the plaintiff as Pine Ridge Realty Corp.), the Dunegrass Golf Course (not a legal entity), and Ronald Boutet (an owner of Pine Ridge Realty, Inc.) as plaintiffs. As the Superior Court correctly noted, the proper plaintiff is Pine Ridge Realty, Inc., and we have recaptioned the case to reflect this fact.

Richard L. Suter (orally), Suter & Assoc., P.A., Falmouth, Douglas F. Jennings, Augusta, Frank J. Kolb, Kolb Crisci & Eisenhandler, East Haven, CT, for plaintiff.

John S. Whitman (orally), Richardson, Whitman, Large & Badger, P.C., Portland, for Mass Bay Ins. Co.

Russell F. Hilliard (orally), Upton, Sanders & Smith, Concord, NH, for Anderson–Watkins Assoc. and St. Angelo.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] Pine Ridge Realty, Inc., appeals from a judgment of the Superior Court (York County, *Fritzsche, J.*), entered against it and in favor of Massachusetts Bay Insurance Company, Anderson–Watkins Associates, Inc., and Stephen P. St. Angelo, concluding that Pine Ridge was not entitled to insurance coverage for floodwater damage to its property, known as the Dunegrass Golf Course. Massachusetts Bay cross appeals from the court's denial of its request for attorney fees. We affirm the judgments.

## I. BACKGROUND

[¶ 2] In October of 1996, Hurricane Lili roiled off the coast of New England. The Dunegrass Golf Course, which was in the process of being developed and expanded, suffered substantial damage as a result of

flooding that followed torrential rains.[2] Pine Ridge sought recovery for those damages from its insurer, Massachusetts Bay Insurance Company. After investigation of the claim, Massachusetts Bay concluded that no insurance against the perils of flood or groundwater had been sought by Pine Ridge or provided under any of the current policies. It declined to pay for the costs of replacing the damaged areas of the golf course, thereby giving rise to this action.

[¶ 3] The golf course at issue is located in Old Orchard Beach. In the late eighties, Pine Ridge purchased the original nine-hole course along with 250 adjacent acres. In 1996, Pine Ridge began construction of an eighteen-hole "championship" golf course, anticipating the development of a significant number of surrounding residential units. Prospective lenders required Pine Ridge to obtain certain insurance. To comply with financing requirements, Ronald Boutet, on behalf of Pine Ridge, contacted Stephen St. Angelo of Anderson–Watkins Associates, an insurance agency. St. Angelo arranged for coverage through Massachusetts Bay during the course of construction of new holes at the Dunegrass Golf Course.

[¶ 4] Several different types of coverage were originally discussed, including tees and greens, general liability, builder's risk, and business interruption coverage. St. Angelo arranged to have a binder issued by Massachusetts Bay and provided the binder to Boutet. Boutet did not question the coverage addressed in the binder or request further coverage.

[¶ 5] Just over a month after the binder was issued, and before the new policy endorsements were issued, the flooding occurred, and Boutet was told that the policies he had purchased did not include flood insurance. He and his corporation brought suit against Massachusetts Bay, as well as St. Angelo and his firm, Anderson–Watkins Associates, Inc.

[¶ 6] Through an amended complaint, Pine Ridge presented a claim for breach of contract and breach of the implied covenant of good faith and fair dealing against Massachusetts Bay. It also claimed that Massachusetts Bay, St. Angelo, and Anderson–Watkins had knowingly misrepresented "pertinent facts and policy provisions" in violation of 24–A M.R.S.A. § 2436–A(1)(A), (D) (1990), and that St. Angelo and Anderson–Watkins had been negligent. Anderson–Watkins cross-claimed, asserting that it was entitled to indemnity from Massachusetts Bay to the extent Anderson–Watkins was found liable on Pine Ridge's complaint.

[¶ 7] Following a lengthy and somewhat contentious discovery period,[3] Pine Ridge presented its case in a bench trial. Over seven days, the court heard testimony regarding the historical facts that led to the dispute. In the end it was faced with several questions central to the claims: whether Boutet requested flood insurance; whether Massachusetts Bay agreed to provide flood insurance; and whether Massachusetts Bay failed to live up to its commitment.[4]

[¶ 8] In a detailed and thoughtful decision, the trial court concluded that the answer to each question was "no." The court found that no request for flood insur-

---

2. Although there was some question as to whether the rains were an actual part of the hurricane or a meteorological consequence of the proximity of the storm, there is no doubt that the ensuing rains were unprecedented. Approximately nineteen inches fell during a 36–hour period beginning on October 20, 1996.

3. Eventually, a discovery master was appointed to resolve disputes.

4. There was some confusion in terminology throughout the trial. It appears that there was a single policy in place that originally covered the existing nine-hole course, with a number of subsequent endorsements regarding the new course, the relevant ones being for "builder's risk" and "tees and greens."

ance had been made by Boutet, notwithstanding St. Angelo's efforts to acquire Boutet's attention on the subject; that Massachusetts Bay had never agreed to provide flood insurance; and that neither Massachusetts Bay nor St. Angelo or his firm had breached a contractual, statutory, or common law duty to the developers.

[¶ 9] The evidence revealed that, except in federally designated flood zones, flood insurance is not included in standard property insurance policies. In most policies, including those in question, it is explicitly excluded from coverage. Thus, in the absence of a specific request, flood insurance would not be included in the policies sought by Boutet. In its opinion, the court credited St. Angelo's testimony, and declined to credit much of Boutet's testimony or the testimony of his expert witness.[5] It found that Boutet was "a developer who gave his insurance needs little attention."[6] It further found that St. Angelo specifically informed Boutet that he did not provide flood coverage, that Boutet failed to respond to many questions from St. Angelo, and that Boutet signed a flood insurance checklist indicating that the property was not in an identified flood hazard area and that National Flood Insurance was not being sought.[7] In essence, the court found that Boutet did not request flood insurance despite the opportunity to do so, and that others involved had no reason to believe such insurance was necessary. As the court stated succinctly: "No one expected 19 inches of rain and no one planned on damage to a well drained golf course built on a back sand dune. It was a freak occurrence."

[¶ 10] Turning to the actions of the insurer and the agent, the court found St. Angelo to be a "capable honest insurance agent." It found, however, that Massachusetts Bay had made a mistake when, after the damage occurred, it issued a "named peril" tees and greens policy rather than the "all-risk" policy it had promised in its binder. This apparently occurred because Massachusetts Bay did not ordinarily issue general "all-risk" products for tees and greens coverage. The court then concluded that Massachusetts Bay had bound itself to provide "all-risk" coverage, but that exclusions for flood and groundwater damage were applicable under either type of policy. Because the relevant exclusions were applicable to all policies that Massachusetts Bay had bound itself to provide, whether or not Massachusetts Bay ordinarily issued such policies, Massachusetts Bay's denial of coverage was proper. The court ultimately determined that "the coverage that was requested would not have covered the losses suffered."

[¶ 11] As to the remaining counts, the court found that "coverage decisions were made with sufficient speed and that there were no knowing misrepresentations," and accordingly found no unfair claims settlement practice under 24-A M.R.S.A. § 2436-A. The court also found no breach of the implied covenant of good faith and fair dealing. Finally, the court found that, although Massachusetts Bay had pre-

---

5. For example, the court found that: "[Boutet's] recollection of his dealings regarding insurance coverage was spotty. His damage estimates were evolving, hard to follow and included some excessive costs. His recollection of when seeding was done was questionable as was his recollection of his inquiry at the town hall regarding flood zones in the town." It also found that "[s]ome of the expert witnesses either had an obvious bias, had not adequately prepared or had been assigned only a limited task."

6. The court specifically found that "[d]espite his protests to the contrary Boutet had only a passing interest in the details of his insurance

coverage.... It was clear, given the inattention over substantial periods followed by the need for immediate action, the lack of response to many questions from the agent, the starting of construction before insurance coverage was in place and the purchasing of coverage that was not fully appropriate, that the lenders dictated the coverage."

7. The court noted that this type of insurance would not have been available at any rate because the National Flood Insurance Program is generally limited to improved real estate.

vailed, its conduct in mistakenly issuing the wrong policy contributed to the need for a trial. The court found insufficient evidence of fraud, misrepresentation, or concealment on the part of Boutet or Pine Ridge, and accordingly denied Massachusetts Bay's request for attorney fees. This appeal followed.

## II. DISCUSSION

[¶ 12] Pine Ridge presents multiple theories under which it argues that the court's judgment must be vacated. Because the agreement of the parties is central to Pine Ridge's claims, we limit our discussion to determining whether the court erred when it concluded that Pine Ridge failed to meet its burden of proving that Massachusetts Bay breached its contract. In essence, Pine Ridge argues that the contracts at issue, consisting of the binder and new policy endorsements, are ambiguous and must be construed to include flood and groundwater coverage because Boutet sought, and Massachusetts Bay agreed to provide, that coverage.

[¶ 13] Neither the standard policy language nor the binder explicitly provided for flood or groundwater coverage. The new policy endorsements, as issued, as well as industry standard policies and Massachusetts Bay's standard policies, specifically excluded that coverage. Thus, Pine Ridge cannot obtain coverage under the contract unless an ambiguity in the contract is somehow read to include the coverage excluded by the policy language.

[¶ 14] Whether a contract is ambiguous is a question of law that we review de novo. *See Devine v. Roche Biomedical Laboratories, Inc.*, 637 A.2d 441, 445 (Me. 1994). "Contract language is ambiguous when it is reasonably susceptible to different interpretations." *Kandlis v. Huotari,* 678 A.2d 41, 43 (Me.1996), *quoted in Spottiswoode v. Levine,* 1999 ME 79, ¶ 16, 730 A.2d 166, 172. In the insurance context, when a loss occurs after a binder has been issued, but before a policy is written, the insurer is bound to provide coverage in line with its standard policies referenced in the binder, *see Auto–Owners Ins. Co. v. Jensen,* 667 F.2d 714, 723 (8th Cir.1981); *Matousek v. South Dakota Farm Bureau Mut. Ins. Co.,* 450 N.W.2d 236, 238 (S.D. 1990), or policies standard throughout the industry, *see Hartford Fire Ins. Co. v. Bonsera,* 177 Misc.2d 55, 675 N.Y.S.2d 827, 829 (Sup.Ct.1998); 2 ALAN D. WINDT, INSURANCE CLAIMS & DISPUTES § 6.36 n.348 (3d ed. 1995 & Supp.1999). In those instances, when the terms of the binder conflict with the terms of the standard policy, an ambiguity arises, and the binder and policy will be construed together with the most liberal provision, in favor of the insured, controlling. *Cf. Crouse West Holding Corp. v. Sphere Drake Ins. Co., PLC,* 248 A.D.2d 932, 933, 670 N.Y.S.2d 640 (1998); *see also Union Mut. Fire Ins. Co. v. Commercial Union Ins. Co.,* 521 A.2d 308, 310 (Me. 1987) ("It has long been the rule in Maine that insurance policies are to be liberally construed in favor of the insured and strictly construed against the insurer that drafted the policy.").

[¶ 15] Pine Ridge argues that the all-risk tees and greens endorsement should be construed to have provided for flood coverage because the binder and subsequent policy "did not match," and because the terms of the binder did not explicitly mention flood and groundwater damage as excluded from coverage.[8]

---

**8.** Pine Ridge also contends that the builder's risk policy is ambiguous and should be construed to provide flood coverage. This argument, however, is not persuasive. Pine Ridge argues that an ambiguity arises because the policy only covers "structures" and a golf course is not a "structure." Although Pine Ridge may be correct that this creates an ambiguity, the resolution is to interpret the term "structure" to include the course, *see Union Mut. Fire Ins. Co. v. Commercial Union Ins. Co.,* 521 A.2d 308, 311 (Me.1987) (noting when ambiguity exists court will interpret strictly against insurer), and not to interpret the policy to provide coverage not intended by the parties.

## A. Construction of the Contract

[¶ 16] We must therefore determine whether the terms of the binder and the policy are inconsistent. We begin the analysis by accepting the court's conclusion that Massachusetts Bay bound itself to provide all-risk tees and greens coverage rather than the named peril coverage it issued. Once the pertinent language of the policy is identified, we compare the language in the policy with the language of the binder.

[¶ 17] The court found that a standard all-risk tees and greens policy would have excluded coverage for flood or groundwater damage. We find no error in that determination. First, the record supports the conclusion that if Massachusetts Bay had in fact issued an all-risk policy, the policy would nevertheless be subject to a flood exclusion. Second, the record supports the conclusion that standard all-risk tees and greens policies used throughout the industry would also exclude flood coverage.[9] The court credited the testimony of Paul Heywood, an adjuster employed by Massachusetts Bay, that the standard policies issued by a significant portion of the insurance industry excluded flood coverage.[10]

[¶ 18] Thus, we compare a standard all-risk policy, which would explicitly exclude flood and water damage, with the binder at issue. The binder, necessarily general in its terms, clearly notified Pine Ridge that it was subject to "limitations" not enumerated in the binder. Those limitations included exclusions for flood and groundwater coverage, as would be contained in a standard all-risk policy. Reading the binder and policy together, no ambiguity is shown. *See Chadwick–BaRoss, Inc. v. T. Buck Const., Inc.*, 627 A.2d 532,

535 (Me.1993) (holding contract need not negate every conceivable construction of its terms in order to be unambiguous). Accordingly, as the court concluded, although Pine Ridge is entitled to the "all-risk" coverage promised under the binder rather than "named peril" coverage provided in the policy that eventually issued, it is not entitled to flood or groundwater coverage.

## B. Intent of the Parties

[¶ 19] Pine Ridge also argues that because the language of the binder did not explicitly enumerate the exclusions, an ambiguity as to the original agreement of the parties is created that requires the court to determine the parties' intent. Initially, we reject the argument that the binder must contain an explicit enumeration of exclusions or limitations in order to be binding on the insured. An insurance binder is, of necessity, a much abbreviated version of the anticipated policy. *See* 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 13:2 (1997). "Generally, a binder contemplates a subsequent and more formal agreement, and by its nature incorporates the terms of the prospective policy whether those terms are prescribed by law or are part of the customary policy issued by the insurer." *Id.* § 13:1. Accordingly, the fact that the binder was issued in summary fashion, with references to "limitations" rather than an elucidation of those limitations, does not in itself create an ambiguity, when construed in light of an agency or industry standard policy of the same type.

[¶ 20] Assuming, however, for purposes of argument, that an ambiguity did exist, we are nonetheless unpersuaded that the court erred. Although we agree with Pine Ridge's assertion that when an insurance

---

9. Contrary to Pine Ridge's contention, the fact that it was eventually able to purchase all-risk coverage that included coverage for flood or groundwater damage does not establish that it is customary in the industry to include flood coverage in standard all-risk tees and greens policies.

10. Even Pine Ridge's expert testified that Massachusetts Bay would have had no reason to issue flood coverage without a specific request.

policy is ambiguous, the terms of the policy will be construed against the insurer, *see Union Mut. Fire Ins. Co.*, 521 A.2d at 310, this maxim is insufficient to achieve Pine Ridge's desired result because the parties neither intended nor expected that flood or groundwater damage would be covered.

[¶ 21] The touchstone of contract interpretation is the intent of the parties. *See Whit Shaw Assoc. v. Wardwell*, 494 A.2d 1385, 1387 (Me.1985); *City of Augusta v. Quirion*, 436 A.2d 388, 391 (Me.1981). We will not interpret an ambiguous insurance contract to provide coverage that was never contemplated by the parties. *See, e.g., Bourque v. Dairyland Ins. Co.*, 1999 ME 178, ¶¶ 9–10, 741 A.2d 50, 53.[11]

[¶ 22] The court found that Boutet did not ask for or expect flood and groundwater insurance, and that Massachusetts Bay did not offer to provide it. Because the property was not in a flood zone, the lenders didn't require it. Because no one anticipated this "billion year occurrence," no effort was made by Boutet to obtain the coverage. Because the parties did not intend for the policies to include that coverage, no amount of ambiguity elsewhere in the contract language will draw that coverage within its terms.

[¶ 23] With the hindsight afforded him in the aftermath of an extraordinary weather event, Boutet argues that any coverage he obtained should have included coverage for the catastrophe. The court, however, does not have the authority to rewrite the contract. *See Apgar v. Commercial Union Ins. Co.*, 683 A.2d 497, 500 (Me.1996). It was called upon to determine the intent of the parties and it did so on the evidence presented.[12]

[¶ 24] The court's findings are amply supported by the record. St. Angelo's file, introduced at trial, indicates that Boutet requested coverage tailored to meet his lenders' requirements. The loan documents establish that flood coverage was required only if the property was located within a flood hazard area. The golf course was not situated in the flood zone. Boutet never made a specific request for flood or groundwater coverage, nor is it surprising that he did not; the evidence demonstrated that the golf course sat on land that was not in a flood zone, was planted over sand dunes, and was approximately 100 feet above sea level. Additionally, St. Angelo testified that he had advised Boutet that the policies Boutet's lenders had requested generally excluded flood coverage. He also faxed Boutet a memo, admitted into evidence, noting, among other things: "We do not provide Workers' Compensation, Flood or Loss of Rents coverage now. Perhaps you have coverage elsewhere? All are needed by bank?" Boutet never responded to that fax.

[¶ 25] Accordingly, notwithstanding the lack of specificity in the binder's reference to "limitations," the court did not err in concluding that Pine Ridge did not bargain for and is not entitled to flood or groundwater coverage.

## C. Pine Ridge's Alternative Arguments

[¶ 26] Finally, although Pine Ridge asserts that the court erred in several other respects, we find no error. The court did not err in concluding that the losses suf-

---

11. If a contract is ambiguous, the court may consider extrinsic evidence regarding the intent of the parties. *See Handy Boat Serv., Inc. v. Professional Servs., Inc.*, 1998 ME 134, ¶ 13, 711 A.2d 1306, 1309.

12. Many of Pine Ridge's arguments challenge the credibility determinations of the court. Arguments that evidence should be viewed in one light rather than another are properly made to the trial court, and have no efficacy in an appellate review. *See Estate of Siebert*, 1999 ME 156, ¶ 10, 739 A.2d 365, 368. We will not set aside findings of fact unless they are clearly erroneous, and we give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *See id.; see also* M.R. Civ. P. 52(a).

**602**

fered resulted from perils excluded from coverage;[13] in concluding that Massachusetts Bay was not estopped from denying flood coverage, *see Roberts v. Maine Bonding & Cas. Co.*, 404 A.2d 238, 241 (Me.1979); or in finding that Massachusetts Bay had not made any knowing misrepresentations regarding "pertinent facts of policy provisions relating to coverage at issue," *see* 24–A M.R.S.A. § 2436–A(1)(A).[14]

[¶ 27] Nor did the court err in granting St. Angelo's and Anderson–Watkins's motion for judgment as a matter of law pursuant to M.R. Civ. P. 50(d). When reviewing a judgment entered pursuant to Rule 50(d), we are "not required to view the evidence in the light most favorable to the plaintiff. Rather, we must accept the facts found by the court unless those findings are clearly erroneous." *McCarthy v. U.S.I. Corp.*, 678 A.2d 48, 50–51 (Me.1996) (citing *Smith v. Welch*, 645 A.2d 1130, 1132 (Me.1994)). The trial court's factual and legal conclusions were fully supported by competent evidence in the record. *See Paffhausen v. Balano*, 1999 ME 169, ¶ 9, 740 A.2d 981, 983. The other contentions of Pine Ridge do not merit discussion.

### D. Massachusetts Bay's Claim for Attorney Fees

[¶ 28] Finally, Massachusetts Bay argues that the trial court erred in declining to award it attorney fees. Title 24–A, section 2186 gives the court the discretion to award fees when "it is proven that a person committed a fraudulent insurance act." 24–A M.R.S.A. § 2186(7) (2000).[15] Massachusetts Bay argues that Boutet committed fraudulent acts when he padded his damage claims, lied under oath regarding his damages and the date he seeded the course, and tampered with evidence by re-creating a construction log.

[¶ 29] We afford the trial court wide discretion in determining whether or not to award attorney fees, *see Mancini v. Scott*, 2000 ME 19, ¶ 10, 744 A.2d 1057, 1061, and we review the trial court's factual conclusions for clear error, *see White v. Zela*, 1997 ME 8, ¶ 3, 687 A.2d 645, 646. The court noted that it was troubled by the actions of Boutet, but concluded that fees were inappropriate because Massachusetts Bay's errors "contributed in part to the need for the trial" and because the court did not find "sufficiently clear evidence of wrongdoing by plaintiffs to constitute misrepresentation, concealment, or fraud." This decision was supported by the record and was, therefore, neither an abuse of its discretion nor clear error.

The entry is:

Judgment affirmed.

---

13. Pine Ridge argues that some of the damage may have been caused by the mere presence of rain without the consequent flooding or, alternatively, by wind alone. The court rejected Boutet's effort to change the characterization of the damage, finding that Boutet attempted to describe the loss "in a way that would fit his evolving knowledge of his coverage." The record fully supports the court's findings and demonstrates a constantly changing approach to damages by Boutet, demonstrated in part by his damage estimate of approximately $120,000 during discovery that became $1.2 million at trial. The court, concerned that Boutet's damage estimates were "hard to follow and included some excessive costs" eventually required Boutet to take a recess during his testimony to obtain some perspective before he continued to testify under oath. On this record, we cannot say that the court's finding is clearly erroneous.

14. In the strongest terms, the court swept aside Pine Ridge's argument that the insurance company had engaged in fraud or bad faith, finding that the issuance of the named peril policy, rather than an all-risk policy was an unintended error.

15. Because we find no error, we do not consider whether section 2186 is applicable to the current claim. Section 2186, enacted as emergency legislation on March 11, 1999, was made retroactive to June 30, 1998. The complaint was filed on January 17, 1997.