STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-09-0777

ANTHONY SAVASTANO
and JUDY SAVASTANO,

    Plaintiffs

    v.

                       JUDGMENT

DIAMOND COVE HOMEOWNERS
ASSOCIATION,

    Defendant

STATE OF MAINE
Cumberland, ss, Clerk's Office

FEB 10 2011

RECEIVED

## BACKGROUND

On March 22, 2010, the plaintiffs Anthony and Judy Savastano filed a five-count amended complaint[1] against the defendant Diamond Cove Homeowners Association. At issue in this case is the defendant's operation of vehicles over Nancy Lane, the road adjacent to the plaintiffs' property, and use of the State Pier at the southern end of Great Diamond Island (GDI).

In count I, the plaintiffs ask the court to declare that the defendant does not have the right to operate unauthorized shuttle buses or other vehicles on Nancy Lane on GDI for unauthorized purposes or to operate any vehicles on Nancy Lane at unreasonably frequent intervals and/or at unreasonable times and for injunctive relief regarding operation of vehicles and the Diamond Cove (DC) Pier; in count II, the plaintiffs allege a public nuisance resulting from the defendant's use of Nancy Lane; in count III, the plaintiffs allege a common law nuisance resulting from the defendant's use of Nancy

---

[1] The original four-count complaint was filed on March 30, 2009. After the assignment to the plaintiffs from the Island Institute, discussed below, the complaint was amended to include count V, breach of contract.

Lane; in count IV, the plaintiffs allege trespass by the defendant; and in count V, the plaintiffs allege breach of contract by the defendant.

Jury-waived trial was held on November 29 and December 1-3, 2010. The court has considered the testimony of the witnesses, the exhibits, the pretrial and post-trial submissions of counsel, and their arguments.[2] For the following reasons, judgment is entered in favor of the defendant and against the plaintiffs on all counts of the plaintiffs' amended complaint.[3]

---

[2] During the trial, the court granted the defendant's motion to exclude the testimony pf the plaintiffs' proposed expert witness, Eric Wieberg. His opinion that the cracks in the plaintiffs' home could be related to vibration of the structure and that the defendant's vehicles caused the damage to the plaintiffs' home was not supported by the record and, in particular, was not supported by the testimony of Mr. Wieberg or Ms. Savastano.

[3] At the close of the plaintiffs' case, the defendant moved for judgment as a matter of law on all counts of the plaintiffs' amended complaint. M.R. Civ. P. 50(d). The court deferred ruling on the motion.

Rule 50(d) provides:

> In an action tried by the court without a jury, a motion may be made at any time for judgment as a matter of law on any claim. The motion shall specify the claim or claims as to which judgment is sought and the issue or issues as to which it is contended that the law and the facts entitle the moving party to judgment. Before considering the motion, the court shall ascertain that the party opposing the motion has been fully heard with respect to the issue or issues raised. If the court finds against the party opposing the motion on any issue that under the substantive law is an essential element of any claim, the court may enter judgment as a matter of law against that party on that claim. Alternatively, the court may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits, the court shall upon request make findings as provided in Rule 52(a).

M.R. Civ. P. 50(d). Rule 50(d) is the functional equivalent of an involuntary dismissal under Rule 41(b)(2) of the Federal Rules of Civil Procedure or a directed verdict in a jury case. M.R. Civ. P. 50 advisory committee's note to 1983 amend. "The judge, however, does not merely decide the legal sufficiency of the plaintiff's evidence but may decide the factual issues and render judgment against the plaintiff, making findings of fact and conclusions of law under Rule 52(a)." Id. (citing 1 Field, McKusick, and Wroth, Maine Civil Practice § 41.7 (2d ed. 1970)). The court's factual findings will be upheld unless clearly erroneous. Pine Ridge Realty, Inc. v. Massachusetts Bay Ins. Co., 2000 ME 100, ¶ 27, 752 A.2d 595, 602 (citing McCarthy v. U.S.I. Corp., 678 A.2d 48, 50-51 (Me. 1996)).

The court is satisfied that the defendant's motion for judgment could be granted on all counts of the plaintiffs' amended complaint. In the interest of the parties and judicial economy, the court has considered all of the evidence and made findings and conclusions based on the entire record.

FINDINGS

### 1. The Development of Diamond Cove

GDI is part of the City of Portland. (Exs. 34, 35.) The plaintiffs own property at the south end of GDI adjacent to the State Pier, a public pier. (Ex. 1.) Access to the State Pier is provided by Nancy Lane, which was accepted as a public way by the City of Portland on February 1, 1960.[4] (Id.) Nancy Lane crosses the plaintiffs' property and abuts the plaintiffs' house. (Id.) The City of Portland maintains Nancy Lane and the public has the right to use Nancy Lane. The defendant is not required to maintain Nancy Lane.

In 1982, Dictar Associates[5] purchased Fort McKinley, a military installation at the north end of GDI and "an exquisite example of colonial revival architecture," according to David Bateman. In the fall of 1984, the first meeting before the Portland Planning Board regarding DC and the proposed island residential zone, IR-3, was held. (Ex. 7; see Exs. 100, 118.) The IR-3 zone provides for "high density of development" on the islands. (Id. at 1.)

The City requested that Dictar participate in the rezoning process required for DC. Mr. Bateman explained the development plans. No one else from the public spoke. (Ex. 2.) Mr. Bateman recalled that, during the rezoning process, vehicles operated by DC homeowners and vehicles operated by DC employees were distinguished. (Ex. 33, § xi.) The right to operate commercial transportation to the State Pier was reserved.

---

[4] Ms. Savastano testified that the plaintiffs believe they own part of Nancy Lane. They believe they own to the centerline north from the intersection of Nicholas and Nancy Lanes. They believe they own the entirety of Nancy Lane to the south of the intersection.

[5] David Bateman testified that he and Mssrs. Dobson, Tarbox, and Waslevski consummated the transaction in 1982.

3

Attorney John Patterson was hired to represent the Diamond Island Association before the Planning Board. The Diamond Island Association represented the interests of residents of the south end of GDI. Attorney Patterson presented proposed findings of fact to the Board, which outlined the Diamond Island Association's position at the time with regard to development of DC. (Ex. 189.) Those findings provide, in part:

> In light of all of the above we find that the project should be approved with the condition that: (1) no automobiles or vehicles be permitted on the project other than emergency, service and maintenance and group transportation vehicles; and (2) no motor vehicles be used outside the development except for emergency purposes or for access to the existing ferry pier by group transportation vehicle.

(Ex. 189, p. 3.)

Additional Planning Board meetings were held into the spring of 1985. Discussions concerned the imposition of conditions to satisfy the concerns of the residents of the south end of GDI. Finally, in 1985, the City Council amended its zoning code (CZA) and rezoned DC as IR-3. (Ex. 2.) Paragraphs eight and nine of the CZA provide:

> 8. Water transportation service. The Owner (DCA) shall use its best efforts to secure from the Casco Bay Island Transit District year-round common carrier water transportation service to, from and between the Portland waterfront and Diamond Cove via a suitable docking facility[6] on the Premises (Fort McKinley Property) and on a schedule to be established by the carrier based upon passenger demand; provided, however, that in the event that such service is or at any time becomes unavailable, the Owner shall, at it own expense, provide an equivalent alternative to such service, subject only to the approval thereof by the Public Utilities Commission, or such other regulatory authority having jurisdiction thereof.

> 9. Restrictions on motor vehicles. Except for vehicles used primarily for construction, maintenance, service and the common transportation of goods and passengers, and fire protection, public safety and emergency vehicles, no motor vehicles, as defined in 29 M.R.S.A.

---

[6] The DC pier was eventually rebuilt at a cost of $750,000.00 - $780,000.00. Casco Bay Lines extended service to the rebuilt DC pier.

Section 1(7), but including snowmobiles, shall be operated or stored, temporarily or otherwise, on the Premises.

(Ex. 2 at 46.)

After the CZA, the DC development proceeded in two phases. Phase I involved residences in the renovations to Fort McKinley. Phase II involved single-family residences along the shore of the island. Approvals from the Planning Board, the Department of Environmental Protection (DEP), and the Environmental Protection Agency (EPA) were required for the development.

Phases I and II were ultimately approved. The December 10, 1986 site location approval from the DEP for Phase I references the transportation language in the 1985 CZA. (Ex. 3, ¶ 11A; Ex. 2, p. 46, ¶ 9.) On July 10, 1987, the Portland Planning Board approved the application to develop phase I of DC. In the approval, the Board stated:

> No private motor vehicles belonging to a lot owner or guest shall enter or exit the southerly boundary of the Diamond Cove property. This restriction shall be incorporated in the recorded Homeowners Association documents and on the subdivision recording plat.

(Ex. 33, ¶ 1(xi).) A draft of the General Declarations and Covenants and Restrictions for DC was prepared by Attorney Rick Shinay and sent to the DEP. (Ex. 178.)[7]

An amendment to the draft Declarations was negotiated by counsel for DCA and the organizations and was added to paragraph 4.7:

> No motorized vehicles of any kind, including golf carts, shall pass south of the southerly boundary of the properties except for fire equipment, ambulances or public safety vehicles in the performance of their duties, and designated Association owned vehicles which transport persons and/or goods between the properties and the pier located at the southerly end of Great Diamond Island.[8]

---

[7] Exhibit 9 is the final, signed Declarations.

[8] Amended paragraph 4.7 reads in its entirety:

> 4.7 Parking; Automobiles and other Vehicles: Each owner shall have the right to own and operate one (1) golf cart on the properties. No automobiles, trucks, recreational vehicles, all-terrain vehicles, motorcycles, snowmobiles or other motorized vehicles will be parked or kept on the properties except by the

5

(Exs. 178, pp. 7-8, ¶ 4.7; 213.) The June 25, 1991 site location approval for Phase II incorporated the amended Declarations. (Exs. 6, p. 18, ¶ 8; 213.) The Island Institute agreed to the Amended Declaration of Covenants and Restrictions. (Ex. 213.)

Philip Conkling is the founder and President of the Island Institute and the administrator for the Maine Island Coalition. The Island Institute helps island residents advocate for themselves and to join as a unit with a common agenda regarding community development and natural resource protection and management. The Island Institute promotes local consensus and facilitates local decision making. After the 1984 Planning Board meeting, the Island Institute was contacted by Diamond Island Association Committee member Marjorie Foster, who wanted technical advice and representation regarding the DC development before the Portland Planning Board for GDI residents. The Island Institute also represented the Diamond Island Association and Casco Bay Development Organization. The Island Institute and the Audubon Society of Maine were also asked to represent the GDI residents before the DEP and EPA.

Ultimately these groups intervened in the proceedings before the DEP and EPA regarding approval of the development phases for DC and entered agreements with DC. The Island Institute had never previously entered agreements like those of 1989 and 1991 and has not since. (Exs. 4, 5.) Mr. Conkling understood that there would be no

---

Association or its agents for maintenance or service purposes, including the common transportation of goods and passengers, fire protection, public safety and emergency purposes, or by contractors engaged in construction activities. No motorized vehicles of any kind, including golf carts, shall pass south of the southerly boundary of the properties except for fire equipment, ambulances or public safety vehicles in the performance of their duties, and designated Association owned vehicles which transport persons and/or goods between the properties and the pier located at the southerly end of Great Diamond Island.

(Ex. 9, p. 7. ¶ 4.7.)

impact to the south end of GDI from the DC development because the IR-3 zone would be self-contained on the north end of GDI and no vehicles were to be allowed in the IR-3 zone with some exceptions. (Ex. 2, p. 46, ¶ 9; Ex. 4, p. 6, ¶ D(1).) He understood further that there would also be no impact on the south end because Dictar would either negotiate an additional ferry stop at the north end or run a private water taxi to Portland. (Ex. 2, p. 46, ¶ 8.)

The March 2, 1989 agreement among DCA and the Island Institute, Audubon Society of Maine, and the Conservation Law Foundation with regard to Phase I provides:

> DCA agrees that no motor vehicles of any kind (automobiles, golfcarts, snowmobiles, ATV's etc.) shall pass from the DCA property to the southern part of the Island. The only exceptions shall be fire equipment, ambulances and designated "taxis" (shuttle vans) which might transport persons from the Fort McKinley property to the pier at the southern end of the Island. All construction vehicles, equipment and materials must be landed and off-loaded or loaded on DCA property. To the extent that this condition is not already a part of the Site Location Order -- paragraph 11 -- DCA will seek an amendment to reflect this limitation. Except as above provided, DCA agrees that automobiles will not be operated in the IR-1 or IR-3 zones.

(Ex. 4, p. 6, ¶ D(1); see also Ex. 2, p. 46, ¶ 9.) Several days later, the term "shuttle" was deleted from this agreement. (Ex. 4, p. 6, ¶ D(1); Amendments, p. 2, ¶ D(1).)

The April 12, 1991 agreement among DCA, the Island Institute, the Audubon Society of Maine, and the Casco Bay Island Development Association with regard to Phase II provides:

> DCA, Maine Audubon Society, Casco Bay Island Development Association and Island Institute agree to each proceed in good faith using their best efforts to accomplish the matters contemplated hereby, including, without limitation, to draft and agree upon a revised set of Design Review Guidelines and an amended and restated Declaration of Covenants and Restrictions which accomplish the matters addressed herein to the satisfaction of counsel for each of the parties hereto. DCA agrees to use its best efforts to obtain the consents of its mortgagees and

7

ground lessors and of any and all owners of lots within the project to the amended and restated Declaration of Covenants and Restrictions.

(Ex. 5, p. 5, ¶ J.) This 1991 agreement ended the litigation resulting from the denial of DCA's 1987 application to the DEP for site location approval. This agreement also resulted in the organizations withdrawing their opposition to Phase II of DC. (Ex. 5, p. 1.)

In the early 1990s or perhaps earlier, the residents of the south end of GDI were concerned about residents of the north end driving private motor vehicles to the south end. (Ex. 189.) That concern continued into the 2000s. South end residents Paul and Nancy Gleason actively tried to prevent this operation. The Gleasons, the Smiths, and the plaintiffs were represented by Attorney John Bannon, the plaintiffs' attorney in this current lawsuit. Attorney William Robitzek,[9] Vice President of the Diamond Island Association and Jim Grout, President of the Diamond Island Association, represented the Diamond Island Association in its negotiations with the defendant. Some residents believed that Attorney Robitzek was willing to concede more than was appropriate during the negotiations. Ms. Gleason wrote to her neighbors and encouraged them to contact Attorney Robitzek and Mr. Grout about maintaining the Association's original position. (Ex. 203; see also Exs. 191, 212.)

By letter dated February 6, 2004 to the Mayor of Portland, Attorney Bannon complained that the City had not enforced the ordinances and permit conditions that apply to DC. Attorney Bannon informed the Mayor that his clients would file a lawsuit regarding motor vehicle regulations on GDI if the motor vehicle regulations were not

---

[9] Attorney Robitzek was disappointed that some residents ultimately decided to litigate. (Ex. 185.)

enforced. (Ex. 207.) A lawsuit was filed in 2004 but was withdrawn when the City amended the Zoning Ordinance.[10] (Id.)

Beginning in 2001-2002, the residents of the south end of GDI also were concerned about the DC residents' use of golf carts and parking at the State Pier. Attempts to solve the problems took place from 2001 to 2004. An agreement was reached by the negotiators during mediation. The defendant accepted the agreement but the Diamond Island Association and the Civic Association rejected the agreement. The defendant wrote to the Portland City Council in December 2003 regarding the controversy. (Ex. 139.) The defendant stated that if discussions were discontinued, the defendant would return to the "original restrictions" that prohibited private vehicles from operating in DC and private vehicles from traveling to the south end. (Ex. 9, § 4.7.)

On May 18, 2004, the defendant applied to amend the CZA to permit operation of golf carts at DC. (Ex. 10, p. 1.) Thomas Lucke was President of the defendant's Board during the negotiations of the 2004 amendment. The defendant was represented by Attorney Calcagni from Verrill Dana. Mr. Lucke addressed the City Council in April 2004 in order to reassure the Council that privately-owned golf carts would remain on DC property. (Ex. 140; see Ex. 150.) In his discussion of cross-border traffic, he did not refer to exempt vehicles that were permitted to travel to the south end. (Id. at 2.)

Mr. Lucke understood that the City officials were exasperated by the controversies on GDI. Many meetings were held and the discussion focused on issues the officials considered insignificant. Mr. Lucke understood that the City's proposed

---

[10] In the complaint, the plaintiffs request review pursuant to Rule 80B and a declaratory judgment. The plaintiffs do not cite the 1989 and 1991 agreements in the complaint. (Ex. 207.)

conditions were intended to resolve the traffic issues and end the debate finally. (Ex. 10 at 4-6.)

Jonathan Dietz served on the defendant's Board from 2002 to the end of 2006 and became President of the Board on July 2004, succeeding Mr. Lucke. The 2004 CZA passed during his presidency. (Ex. 10.) He negotiated a transportation management plan (TMP) with the City. The first of several drafts was submitted within 60 days. (Ex. 10 at 2.)

In his memorandum to the Planning Board regarding the amendment, Portland City Attorney Gary Wood stated:

> Regardless of whether golf carts are allowed by amendment or otherwise, all parties, as far as I know, are in agreement that the only vehicles that were and are supposed to travel from the Cove property to the south side are the types of motor vehicles specifically identified in Restriction 9[11] - i.e., "those used primarily for construction, maintenance, service and the common transportation of goods and passengers, and fire protection, public safety and emergency vehicles."

(Ex. 214, pp. 3-4.) Attorney Wood and his staff prepared the proposed conditions and requirements. (Id. p. 4.) In his memorandum to the Planning Board, Senior City Planner Richard Knowland stated that modification of the golf cart amendment and City Attorney Wood's proposed language "would very clearly articulate the ground rules for southerly travel as well as provide a mechanism to insure enforcement." (Ex. 135, p. 5.)

Later in 2004, the City of Portland amended the 1985 CZA and incorporated proposed conditions. Condition 1(c) provides:

> Only vehicles used primarily for construction, maintenance, service, and the common transportation of goods and passengers, and fire protection, public safety and emergency vehicles, (hereinafter sometimes referred to as "Exempted Vehicles") will be provided by DCHA with the means to open the lower gate and/or the upper gate and only these vehicles may pass to the southerly part of Great Diamond Island. DCHA will arrange

---

[11] This refers to paragraph 9 in the 1985 CZA. (Ex. 2, p. 46, ¶ 9.)

to open the lower gate for these vehicles in order to use the barge landing on DCHA property from which these vehicles may pass to and from the southerly part of Great Diamond Island or remain within the Cove pursuant to Cove regulations.

(Ex. 10, p. 4.)

The 2004 CZA also required a TMP:

Within sixty (60) days of approval of this amendment by the Portland City Council, Diamond Cove Homeowners Association shall file a transportation management plan with the City's Planning Authority that includes but is not limited to a description of the process for allocating vehicle permits; a description of the means and methods of providing transportation for the disabled on the island; a restriction that confines permitted vehicles to established roadways that are presently within the Association property, a description of available common transportation service vehicles and how they will be managed for the needs of residents and visitors; and a description of how construction, supply-delivery and service vehicles from outside the island including barge ingress and egress routes to the island are managed.

(Id., p.2.) The TMP submitted by the defendant provides:

3) COMMON TRANSPORTATION VEHICLES

a. Common Transportation Vehicles are exempt the restriction on crossing through the gates and driving on the southerly side of the Island. All designated exempt vehicles shall obtain approval as such from the City of Portland Island Liaison or the Office of Corporation Counsel.

b. Common Transportation Vehicles must obtain and display a yellow sticker with the designation "Island Use Only" per the city registration system. This sticker does not restrict the use of this vehicle only to the Island, but is used as a means to identify the vehicle as exempt while on the Island.

c. Common Transportation Vehicles shall be comprised of vehicles for two purposes. One would be for transportation of passengers. The types of vehicles for this purpose would be vans, shuttle buses, stretched golf cart or SUV's. The other use would be to transport freight. The types of vehicles for this purpose would be pickup trucks or panel vans.

d. Common Transportation Vehicles will be operated only by DCHA authorized personnel.

e. Common Transportation Vehicles will operate on a fixed schedule to coincide with the ferry schedule to transport people and freight to and from the ferry boats, on an on-call basis to serve the needs of the residents

11

and their guests, and as required for the general operation of Diamond Cove.

f. Common Transportation Vehicles will operate within the boundaries of Diamond Cove only on established streets, roadways, and driveways to private residences. Outside Diamond Cove boundaries on the southerly side of the Island Common Transportation Vehicles will go to the State Pier, or City facilities (trash receptacles, etc.), or other destinations by the most appropriate direct route. Occasionally, Common Transportation Vehicles will be removed from the Island for repairs and maintenance.

g. Periodically Common Transportation Vehicles will be permitted to go off roadways to transport materials, make property repairs, or in times of emergency.

(Ex. 11, pp. 2-3.) By letter dated October 25, 2006, the Director of Planning and Development for the City of Portland informed the defendant that the plan complied with the City Council's order, except for the component that addresses the barge ramp.[12] (Ex. 12.)

In 2005, the Diamond Island Association was concerned about north-south traffic and water transportation issues on GDI. The Island Institute urged the Diamond Island Association to approach the City of Portland because the Island Institute believed the City was the authorized enforcement entity. Mr. Conkling did not believe the Island Institute could enforce the regulations. Since 2005, the Island Institute has not contacted the defendant regarding the traffic concerns.

Efforts to negotiate these concerns took place and agreements were reached but later abandoned. By 2008, members of the Diamond Island Association were very unhappy regarding vehicle traffic at the south end of GDI and were very unhappy with the Island Institute because it had declined to attempt to enforce the 1989 agreement regarding vehicles.

---

[12] The parties stipulated that no agreement was reached regarding the barge landing. (Ex. 12.)

During the pendency of this lawsuit, the Island Institute "reluctantly," as Mr. Conkling testified, assigned to the plaintiffs exclusive enforcement rights with regard to paragraph D(1) of the 1989 agreement.[13] (Ex. 32.) The assignment terminates upon final resolution of this lawsuit. (Id., pp.1-2.) The Island Institute determined that its enforcement of the agreement "would not be a good use of its time." According to Mr. Conkling, the assignment was made because the traffic problem was an issue of great contentiousness, the problem had not been resolved for more than a decade, and the problem would be resolved only by legal action. Mr. Conkling was unaware at the time of the assignment that the plaintiffs were seeking personal damages in this pending lawsuit.

2. The Plaintiffs and Other Residents of the Cottage Community

In 1978, the Gleasons bought a summer home at the south end of GDI. Slow growth occurred on that part of GDI and only six or seven additional homes have been added since 1978. There were certainly fewer vehicles at the south end of GDI in 1978 than currently.

Mr. Gleason was the President of the Diamond Island Association until 1985. In 1984, he learned from Stuart Laughlin, then secretary of the Diamond Island Association, that Dictar had purchased Fort McKinley at the north end of GDI and planned to renovate the buildings and develop that end of GDI into a residential community named Diamond Cove.[14] Dictar was invited by the Diamond Island Association to an informal meeting in Mr. Gleason's backyard because the residents of

---

[13] The Island Institute had never previously entered anything like this assignment to the plaintiffs. In his deposition testimony, Mr. Conkling stated that the Island Institute could not enforce the vehicle restrictions because these were public roads. He testified at trial that he urged the Diamond Island Association to approach the City regarding the traffic issues because he believed the City was the authorized enforcement entity.

[14] Approval was sought for 360 units. Ultimately, 134 units were approved.

13

the south end of GDI wanted to understand the project's impact on their end of GDI. Mr. Bateman attended the meeting.

The residents left the meeting with the understanding that the proposed project would include 360 units and that all the Fort McKinley's buildings would be restored. Dictar might ask Casco Bay Lines to provide service to the project. In any event, they understood vehicle traffic was not anticipated because the DC project would involve a pedestrian development.

Mr. Bateman was also invited to speak also to the Diamond Island Association regarding the DC development. Because the project development plan involved 20-25 million dollars, the Diamond Island Association formed a committee to monitor the project.

Plaintiff Anthony Savastano first visited GDI in the summer of 1978. At that time, the island was very rural with dirt roads and mostly pedestrian traffic. The plaintiffs bought a cottage in the south end of GDI in 1979. In 1985, they sold the cottage and bought the Deering farmhouse, an historic home, where they now live. (Ex. 196.1.) This is the oldest home on the island and was built in the late 1800s. The property is adjacent to the State Pier at the southern end of GDI. The view from the home is spectacular and includes Hussey Sound, Peaks Island, House Island, Little Diamond Island, and the Portland skyline. (Exs. 196.2, 196.4, 196.5, 196.10, 196.48.) The plaintiffs also bought commercial property at DC from McKinley Partners in 1995. Renovations to that DC property were completed in 1998 and the property was sold in 2000.

The plaintiffs lived in Massachusetts when they bought the house and visited GDI regularly on weekends and during the summer. From 2000 until 2006, they lived

14

in California. During the past three years, Mr. Savastano traveled to GDI six or eight times. The winter of 2010-2011 was the first winter the plaintiffs resided on GDI.

Before the plaintiffs purchased their home, Mr. Savastano was aware of the DC development. The plaintiffs attended the Elwell Hall meeting. As a result, they believed that this upscale seasonal resort at DC would be self-contained and self-sufficient. They believed the project would not be a burden on the island community; the project would be an asset. A dock would be built at Diamond Cove and would be used for the project. The gates would be secured. (Exs. 124-126.)

When the plaintiffs bought the farmhouse, the road was close to the house as it is currently but few vehicles traveled the road. Dust was not a problem because there were few vehicles. Nancy Lane was in generally good condition for walking. Ms. Gleason recalled that when she first arrived on GDI in 1978, Nancy Lane was very narrow and consisted of fine sand. The road has widened over the years and is harder because of material added.

After 1985, there was no change in transportation on GDI for several years. Mary Lovelace operated a taxi service and met every boat arriving at GDI. When the cab service ended in 1992, some residents used pick-up trucks or golf carts to commute to the State Pier at the southern end of GDI. Traffic from DC was infrequent. Eventually, after 1997,[15] the types and numbers of vehicles and numbers of trips from north to south changed. There were more golf carts, a trash truck, restaurant trucks, Jeeps, and oil trucks.[16]

---

[15] The plaintiffs' concerns about increased numbers of vehicles, at least in 1995, focused on the south end residents' vehicles. (Ex. 200.)

[16] The majority of the oil was transported to the year-round residences at DC. The south end of the island included mostly summer residents with just five or seven year-round residents.

Prior to 2004, the defendant used small eight-passenger vans for transportation from DC to the State Pier. The plaintiffs did not object initially to the vans. (Ex. 201.) In 2004, two twenty-passenger shuttle buses with tandem wheels were put in service for passengers and pick-up trucks for luggage.[17] According to Mr. Dietz, president of the defendant's Board when the buses were purchased, one-half of the DC residents are middle age or older and the shuttle buses are more convenient for these residents. These buses meet every ferry and are the largest vehicles on GDI except for the trash truck.

Ms. Savastano complained to McKinley Partners and Dirigo regarding her concerns about traffic, speed, people parking on her lawn, and DC residents using the State Pier even when the ferry was scheduled to stop at the DC pier. According to the plaintiffs, the increased use of the Nancy Lane has increased the number of potholes, cracks, and ruts in the road. (Exs. 196.8-30.) Ms. Gleason agreed. Mr. Savastano has requested that the City of Portland perform additional maintenance on Nancy Lane and have an engineering study performed regarding Nancy Lane's ability to handle increased traffic. At the plaintiffs' request, Steve Blaise determined steps that could improve the road but the plaintiffs have not repaired any part of the road. (Ex. 208.) The plaintiffs also hired Eric Wieberg to inspect the road.

The exhaust fumes, dust, and noise from the increased traffic caused the plaintiffs to close the roadside windows and to discontinue use of the roadside porch. The plaintiffs complain that the DC traffic has interfered with their enjoyment of their property. The plaintiffs attribute cracks in the walls of their home to increased traffic on Nancy Lane. (Exs. 196.53-67.)

---

[17] Exhibit 30 shows Nancy Lane five years after the shuttle vans had been in service.

The plaintiffs further believe the value of their home has decreased because of the increased traffic and resulting dust and noise. Ms. Savastano believes the value has been reduced by 10-20%.[18] She testified that the home is "much less valuable" now than when they purchased the home in 1985 because potential buyers would see the buses, which are "shocking" to see on the island.

3. Diamond Cove Homeowners Association and Predecessors

The Fort McKinley property was purchased by Dictar Associates, which later became Diamond Cove Associates (DCA). Mr. Bateman managed the property for DCA until 1997. The management and assets of DC changed from DCA to McKinley Partners and then to the defendant.

When Mr. Bateman left McKinley Partners in 1997, Dan O'Connell, Doug Fogg, Stuart McCampbell, and Rob Myers were the managers. They were present at DC sporadically and did not honor the restrictions. According to Mr. Savastano, this is "how the whirlwind started." Phoenix Partners, owned by Aaron and Nathan Bateman, was responsible for the management of DC. Roger Shoemaker became the on-site manager for Phoenix in 2006

There are two gates separating the two ends of GDI. One on the west shore, called the lower gate, and one to the east, called the upper gate, which was the central entrance to DC. In the 1980s and early 1990s, Tom Leddy was the security person and had keys to the gates, which were locked. The parties stipulated that after 1997, the gates were not locked and McKinley Partners kept the gates open, contrary to the covenants.[19]

---

[18] The plaintiffs have constructed an addition to the house and renovated the basement in spite of their opinion about decreased value. (Ex. 196.1.)

[19] At trial, Ms. Savastano testified that Mr. Shumaker has not tried to keep the gates closed since 2006. During her deposition, she testified that he did try to keep the gates closed.

Robert Whelan became the defendant's president in 2008. The defendant's Board's policy currently is to enforce the north-south traffic restrictions based on the Declaration of Covenants, the TMP, and the 2004 CZA and attached conditions. The defendant discusses with the City the issue of compliance with the requirements. The defendant registers exempt vehicles and golf carts pursuant to the TMP. The CZA requires that the defendant file a list of gate key holders. Exempt vehicles that can travel through the gate and that are owned by the defendant include two vans and two trucks. Other exempt vehicles are owned by the City.

The defendant's policy requires that the gates be kept locked at all times. Exempt or permitted vehicles travel through the gates, which are unlocked, and the gates are then locked by the permitted person with a key.

The defendant has worked with the Diamond Island Association to improve ferry service to DC, to increase the number of ferry trips, and to get a long-term commitment from Casco Bay Lines. The ferry service to DC drops precipitously after Labor Day and does not increase until mid-April. The State Pier ferry is a crucial service to the DC year-round residents. Mr. Whelan agreed that the defendant did not attempt to find alternative water transportation.

Mr. Shoemaker has been the property manager for DC since 2003 for Dirigo Management and for Phoenix Partners. He is present at DC every day and sometimes spends the night. He is assisted by a maintenance technician and two resident assistants. At least one resident assistant is present at DC 24 hours per day. Among Mr. Shoemaker's jobs is to ensure compliance with restrictions on travel pursuant to the TMP. (Ex. 11.) Pursuant to section 3 of the TMP, Mr. Shoemaker sends a list of exempt vehicles to Mike Murray, the Island Liason. Those vehicles display a yellow sticker. The DC vans meet the definition in the TMP. (Id. § 3(c).) Other exempt vehicles include

18

construction and service vehicles, such as oil trucks, CMP trucks, fire trucks, an ATV, a dump truck with a plow, and City of Portland trucks. (Id. § 4(a).) Mr. Shoemaker provides to the City a list of all exempted vehicles. (Id. § 4(c).) No vehicles have been rejected by the City pursuant to the TMP.

In 2008, Mr. Shoemaker obtained 30, non-duplicable keys for exempt vehicles. Each key is numbered and tracked. The gates are locked at all times and monitored by the resident assistants and the maintenance person. The restaurant at DC requested a key. Mr. Shoemaker denied the request and instructed the restaurant vehicle not to travel south of the gate.

Mr. Shoemaker meets with the DC employees weekly. He ensures that they are aware of the traffic restrictions and the gate policy. All employees sign a form that states that the gates must be locked at all times and relocked if a vehicle travels through. If the policy is violated, the employee will be terminated; this policy is enforced and one employee was terminated previously for the violation.

Mr. Shoemaker has addressed complaints from the plaintiffs. He changed the time newspapers were picked up at the State Pier and redirected delivery of gas to the DC pier. Although the speed limit on Nancy Lane is 15 m.p.h., he has requested that his van drivers operate at 10 m.p.h. He agreed that dust is a problem on Nancy Lane; a slower vehicle speed reduces but does not eliminate dust.

CONCLUSIONS

### 1. Count I: Declaratory Judgment

"Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed." 14 M.R.S. § 5953 (2007). Accordingly, pursuant to 14 M.R.S.A. §§ 5951-5963 and M.R. Civ. P. 57, the Superior Court has the discretionary authority "to entertain

19

requests for and to enter declaratory judgments in appropriate circumstances." Capodilupo v. Town of Bristol, 1999 ME 96, ¶ 3, 730 A.2d 1257, 1258 (citations omitted). "The court should exercise its authority to issue such a declaration only when some useful purpose will be served." Id.

Contrary to the plaintiffs' request in count I, the defendant is permitted to transport goods and passengers to and from DC and the State Pier with common transportation vehicles. Since 1985, the enactments regarding traffic from DC and the ferry service have been negotiated and refined and show a clear intent to authorize the defendant's current operation over Nancy Lane. (Exs. 2 at 46; 33, ¶ 1(xi); 178, pp. 7-8, ¶ 4.7; 6, p. 18, ¶ 8; 4, p. 6, ¶ D(1); 4, p. 6, ¶ D(1), Amendments, p. 2,. ¶ D(1); 10, p. 4; 10, p. 2;11, pp. 2-3; 12.) The documents latest in time, the 2004 CZA and the TMP, make clear that the defendant is allowed to operate common transportation vehicles to transport goods and passengers to and from DC and the State Pier.

### 2. Counts II and III: Public / Common Law Nuisance

"In order to prevail on a nuisance claim under section 2701, [a plaintiff] must prove (1) that he was 'injured in his comfort, property, or the enjoyment of his estate,' (2) 'by a common and public or a private nuisance.'" Johnston v. Me. Energy Recovery Co., Ltd. P'ship, 2010 ME 52, ¶ 14, 997 A.2d 741, 745 (citing 17 M.R.S. § 2701).[20] "Section 2701 does not, by its plain language, limit recovery to the nuisances listed elsewhere in the chapter." Id; 17 M.R.S. § 2802.

"To establish a cause of action for common or public nuisance, a party must show that he has 'suffered therefrom some special and peculiar damages other and

---

[20] "Any person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages, unless otherwise specially provided." 17 M.R.S. § 2701 (2011).

20

greater than those sustained by the public generally.'" Charlton v. Town of Oxford, 2001 ME 104, ¶ 27, 774 A.2d 366, 375 (quoting Brown v. Watson, 47 Me. 161, 162 (1859)).

In order to prove a common law cause of action nuisance, the plaintiffs must show:

> (1) The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use;
> (2) There was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended;
> (3) The interference that resulted and the physical harm, if any, from that interference proved to be substantial . . . The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct;
> (4) The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land . . . .

Charlton, 2001 ME 104, ¶ 36, 774 A.2d at 377 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 87 at 622-23 (5th ed. 1984)) (footnote omitted). "The interference must be substantial and unreasonable. Substantial simply means a significant harm to the plaintiff and unreasonably [sic] means that it would not be reasonable to permit the defendant to cause such an amount of harm intentionally without compensating for it." Charlton, 2001 ME 104, ¶ 36, 774 A.2d at 377 n. 10 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 88 at 626 (5th ed.1984)); see Darney v. Dragon Prods. Co., LLC, 2010 ME 39, ¶ 14 n. 3, 994 A.2d 804, 807 (citing Charlton, 2001 ME 104, ¶ 36, 774 A.2d at 377 & n.10).

The plaintiffs allege a public and common law nuisance. As discussed above, the defendant's operation on Nancy Lane does not violate any ordinances, agreements, or approvals.[21] Nancy Lane is a public way and the defendant's vehicles may operate on

---

[21] The defendant's action does not constitute obstruction of a public way.

21

Nancy Lane. There is no intent by the defendant to interfere with the plaintiffs' use and enjoyment of the land.

The plaintiffs have further failed to prove that they incurred special and peculiar damages. First, there is no competent, credible evidence in this record to show that any damage to the plaintiffs' home was caused solely by the defendants' vehicles, as opposed to other vehicles. Second, although owners of property are competent to testify regarding their opinion of the value of their property, the court is not required to accept those opinions and does not in this case.[22] See Garland v. Roy, 2009 ME 86, ¶ 21, 976 A.2d 940, 947. Any dust and noise resulting from increased traffic on Nancy Lane is not peculiar to the plaintiffs. Finally, there is no substantial or unreasonable interference with the land by the defendant.

### 3. Count IV: Trespass

> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
> (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
> (b) remains on the land, or
> (c) fails to remove from the land a thing which he is under a duty to remove.

Restatement (Second) of Torts § 158(a) (1965) (cited in Medeika v. Watts, 2008 ME 163, ¶ 5, 957 A.2d 980, 982); Darney, 2010 ME 39, ¶ 14, 994 A.2d at 807. "Some damage is presumed to flow from a legal injury to a real property right." Gaffny v. Reid, 628 A.2d 155, 158 (Me. 1993) (finding that plaintiffs are entitled to recover at least nominal damages).

The operation of the defendant's vehicles on Nancy Lane does not constitute an intentional entry on the plaintiffs' land. Maine law has not recognized a trespass claim

---

[22] As the photographs show, this is a lovely and desirable home and location.

22

arising from vibrations and particulate interference with property use. Darney, 2010 ME 39, ¶¶ 13-14, 994 A.2d at 807.

### 4. Count V: Breach of Contract

"To establish a legally binding agreement between parties, the mutual assent to be bound by all its material terms must be reflected and manifested either expressly or impliedly in the contract and the contract must be sufficiently definite to enable a court to determine its exact meaning and fix any legal liability of the parties." Smile, Inc. v. Moosehead Sanitary Dist., 649 A.2d 1103, 1105 (Me. 1994); see also June Roberts Agency, Inc. v. Venture Properties, Inc., 676 A.2d 46, 48 (Me. 1996). Whether a contract exists is a question of fact. Smile, 649 A.2d at 1105.

"The interpretation of an unambiguous contract is a question of law." Reid v. Town of Mount Vernon, 2007 ME 125, ¶ 29, 932 A.2d 539, 546 (quoting Guilford Transp. Indus. v. Pub. Utils. Comm'n, 2000 ME 31, ¶ 13, 746 A.2d 910, 914). Whether a contract is unambiguous is a question of law. Richardson v. Winthrop Sch. Dep't, 2009 ME 109, ¶ 9, 983 A.2d 400, 403 "When a contract is unambiguous, its construction is also a question of law." Id. (quotation omitted). A contract is interpreted according to the plain meaning of its language. Id.

Not all contractual rights may be assigned. Salmon Lake Seed Co. v. Frontier Trust Co., 130 Me. 69, 74, 153 A. 671, 673 (Me. 1931). "A contractual right can be assigned unless the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by contract." Goldberg Realty Group v. Weinstein, 669 A.2d 187, 191 (Me. 1996) (quoting Chadwick-BaRoss v. Martin Marietta Corp., 483 A.2d 711, 715 (Me. 1984)); see also OfficeMax, Inc. v. County Qwick Print, Inc., 709 F. Supp. 2d 100,

23

108 (D. Me. 2010); Herzog v. Irace, 594 A.2d 1106, 1108-09 (Me. 1991). The Restatement (Second) Contracts provides:

Assignment of a Right

(1) An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.

(2) A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or

(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or

(c) assignment is validly precluded by contract.

Restatement (Second) of Contracts, § 317.

The assignment by the Island Institute to the plaintiffs is not valid. DCA contracted with environmental groups interested in community development and natural resource development and protection. The assignment to plaintiffs, who had filed a lawsuit that was pending, who seek to protect their rights, and who seek money damages, changes the defendant's duty and increases the burden or risk on the defendant.

Further, the 1989 agreement between DCA and the Island Institute, among others, specifically provides for taxis (vans) to transport persons from DC to the State Pier. The 1991 agreement provides for an amended Declaration, which allows for Association owned vehicles to transport persons and goods between DC and the State Pier.

24

The entry is

Judgment is entered in favor of the Defendant Diamond Cove Homeowners Association and against the Plaintiffs Anthony Savastano and Judy Savastano on Counts I - V of the Plaintiffs' Amended Complaint.

Date: May 10, 2011

Nancy Mills
Justice, Superior Court

CUM--RE-09-077

25

| 01 | 0000002312 | BANNON, JOHN | | | |
|---|---|---|---|---|---|
| | 75 PEARL STREET PO BOX 9785 PORTLAND ME 04104-5085 | | | | |
| F | ANTHONY SAVASTANO | | PL | RTND | 03/30/2009 |
| F | JUDY SAVASTANO | | PL | RTND | 03/30/2009 |

| 02 | 0000007535 | MCKEON, THOMAS | | | |
|---|---|---|---|---|---|
| | 465 CONGRESS STREET PO BOX 9545 PORTLAND ME 04112-9545 | | | | |
| F | DIAMOND COVE HOMEOWNERS ASSOCIATION | | DEF | RTND | 06/08/2009 |

| 03 | 0000008989 | SHUMADINE, JOHN B | | | |
|---|---|---|---|---|---|
| | 75 PEARL STREET PO BOX 9785 PORTLAND ME 04104-5085 | | | | |
| F | JUDY SAVASTANO | | PL | RTND | 03/30/2009 |